**In re Dale ROPER.**

**Dale Roper, Plaintiff,**

**v.**

**Dick Barclay, Director, State of Arkansas, Department of Finance and Administration, Defendant.**

**No. 4:01–bk–40616 E.**

United States Bankruptcy Court,
E.D. Arkansas,
Little Rock Division.

Oct. 19, 2002.

Neil Deininger, Reba M. Wingfield, Deininger & Wingfield, Little Rock, AR, for Dale Roper.

David B. Kaufman, Little Rock, AR, for Arkansas Dept. of Finance & Administration, State of Arkansas and Dick Barclay.

### ORDER GRANTING COMPLAINT

AUDREY R. EVANS, Bankruptcy Judge.

On July 22, 2002, the Court heard Debtor's complaint to determine the dischargeability of taxes owed to the Arkansas Department of Finance and Administration ("DFA"). Neil Deininger, Esq., Reba Winfield, Esq. and Malcolm Bobo, Esq. appeared for the Plaintiff and Debtor, Dale Roper, who was also present. David Kaufman, Esq. appeared for Defendant DFA. After the DFA put on its evidence and rested, the Debtor moved for a directed verdict. Although counsel identified his motion as a motion for directed verdict, the Court is treating it as a motion to terminate the litigation for failure to prove up a *prima facie* case. Such a motion is currently made under Fed.R.Civ.P. 52(c) and termed a "motion for judgment on partial findings." Rule 52 is incorporated by Fed. R. Bankr.P. 7052 which governs Debtor's adversary proceeding in the bankruptcy court. The Court granted Debtor's motion but took the remaining lien issues raised in Debtor's Complaint under advisement to be decided without oral argument as requested by the parties.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (K), and the Court has jurisdiction to enter a final judgment in this case. The following constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### INTRODUCTION

Plaintiff/Debtor filed this adversary proceeding seeking a determination that his Arkansas state tax liability is dischargeable. It is not disputed that the Debtor's state tax liability is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(A)-(B) which provide certain time limitations for discharging taxes. However, the DFA maintains that Debtor's state tax liability is excepted from discharge under 11 U.S.C. § 523(a)(1)(C) which does not allow a tax liability to be discharged if a debtor made a fraudulent return or willfully attempted to evade or defeat the tax. The DFA does not allege that Debtor made a fraudulent return, but rather alleges that Debtor willfully attempted to evade and defeat his state tax

liability arising from his 1996 Arkansas income tax return.

To prove willful evasion, the DFA attempts to show: (1) that the Debtor had the means to pay his taxes when they were due and thereafter, but chose to pay other creditors instead; (2) that Debtor was dishonest regarding his assets and income as shown by certain discrepancies between his income tax returns, financial statements provided to the IRS and DFA, and his bankruptcy petition and schedules; and (3) that Debtor filed bankruptcy only to discharge his tax liability, choosing to reaffirm all other debts in his bankruptcy other than one credit card.

The Debtor maintains: (1) that he did not have the means to pay his taxes when they were due and has been in serious financial trouble since losing his farming operation in 1996; (2) that any discrepancies between Debtor's income tax returns, financial statements and bankruptcy schedules were innocent oversights or could otherwise be explained; and (3) that he filed bankruptcy as a last resort when he was unable to reach settlements with the Internal Revenue Service ("**IRS**") and DFA to compromise his federal and state tax liabilities for amounts he could afford.

## FACTS

On February 2, 2001, the Debtor filed a chapter 7 petition for bankruptcy. Debtor's petition lists three unsecured debts: federal tax liability, including penalties and interest, of $57,000.00; state tax liability, including penalties and interest, of $9,545.00; and credit card debt of $3,387.12. Debtor later amended his petition to show the IRS as a secured creditor with a lien on his homestead, a boat and a trailer. Debtor lists four secured debts which he intends to reaffirm: his home mortgage; the debt on a boat motor incurred by his wife but secured by his property; and two claims for attorneys' fees, each secured by a non-purchase money security interest. Attorney fees owed to Debtor's counsel are also secured by a security interest in a 1993 Dodge Ram truck and a Suzuki King Quad four-wheeler. On April 1, 2001, this adversary proceeding was filed following discussions between Debtor's counsel and the DFA regarding the dischargeability of Debtor's state tax liability in bankruptcy.

For the tax year 1996, the Debtor incurred individual income tax liabilities with the IRS and DFA in the amounts of $39,564.00 and $6,951.00, respectively. Debtor testified that he could not pay his tax liabilities because he lost his farming operation in 1996 and suffered dire financial problems as a result. Debtor explained that he was dealing with one problem at a time and borrowing money from relatives and friends to get by, and did not foresee that he would owe any taxes until it was time to file his return.

The Debtor had farmed for approximately 10 years. Debtor testified that he could not get a crop loan in 1996 to continue his farming operation because Congress had not finalized a farm bill; he explained that the bank could not determine its risk without a farm bill in place specifying what the crop payments paid to farmers would be. The Debtor explained that he owed Regions Bank, a secured creditor, a substantial amount of money, approximately $130,000.00 to $140,000.00. A secured creditor, Case IH, was owed approximately $30,000.00, and other secured creditors, including Southern Farmers, were owed approximately $20,000.00 to $30,000.00, according to the Debtor's testimony. The debts incurred were for farm equipment and expenses and were secured by liens on Debtor's farm equipment and crop payments. Because Debtor could not get a crop loan, he had to liquidate his farming

operation. Prior to selling the equipment which served as collateral for these debts, Debtor had to wash and repair the collateral to realize as much money as possible, and during this time, he was receiving little or no income. Debtor testified that all monies received from the sale of his equipment were paid to secured creditors through the liquidation of his farming equipment and assets. Debtor explained that Regions Bank had a first lien on most of Debtor's property and his crop payments. The checks for crop proceeds were made out to the bank and Debtor, and the bank cashed the checks; the checks were not deposited into Debtor's checking account. Debtor had some additional farm equipment on which Regions did not have a first lien but other creditors did; once Debtor sold his other farm equipment and paid off the first liens, the remaining funds went to Regions. Debtor's documents relating to these transactions are no longer available; Debtor testified that his wife threw them away.

Ms. Judy Bowers, a tax auditor employed by the DFA, testified that she reviewed Debtor's 1996 income tax return after being assigned to look at Debtor's records once the adversary proceeding was filed. Ms. Bowers has been a CPA for nine years and has 12 years experience with the DFA. As part of her review, Ms. Bowers reviewed the Debtor's 1996 income tax return. Ms. Bowers explained that the return revealed that Debtor realized approximately $77,924.00 from the sale of farm equipment, but only $27.00 of the sale proceeds were taxable due to depreciation deductions. Ms. Bowers testified that this showed that Debtor had approximately $77,000.00 of nontaxable income. Ms. Bowers testified that she did not have any knowledge of whether the proceeds were used to pay off the debt on the equipment that was sold. Ms. Bowers acknowledged

that repayment of debt is not reported and is not deductible.

In November 1997, the Debtor entered into an installment agreement with the IRS whereby he agreed to pay $25.00 per month on his federal tax liability. In connection with the installment agreement, the Debtor completed and submitted a Collection Information Statement ("CIS") signed by the Debtor and his wife. In December 1997, Debtor sent a copy of the IRS installment agreement to the DFA and requested that he be allowed to pay $10.00 per month to the DFA on his state tax liability. The DFA accepted $25.00 per month, and the agreement was reviewable every six months. On behalf of the DFA, Wayne McLean, the manager of the DFA's collection office, testified that when reviewing installment payment applications, the DFA tries to get at least what the IRS is getting. Mr. McLean also testified that the DFA accepts the veracity of items reported on the CIS without much investigation. As long as a taxpayer pays the required installments, there are no collection efforts, although statutory liens are filed. Debtor subsequently began making his monthly installment payments and remained current on both the federal and state installment agreements until filing for bankruptcy in February 2001.

Meanwhile, on or about January 21, 1998, the IRS filed a Notice of Tax Lien with the Circuit Clerk of Pulaski County, Arkansas in the face amount of $39,485.19 for federal income taxes. On or about March 2, 1998, the DFA filed a statutory lien with the Circuit Clerk of Lonoke County, Arkansas against the Debtor in the face amount of $8,126.97 for the 1996 state income taxes.

Between January 2000 and March 2001, Debtor negotiated with the IRS to settle his federal tax liability in full. The Ropers pursued a "bankruptcy based offer in com-

promise." In a letter to the IRS in October 2000, the Ropers' attorneys, the law firm of Deininger & Wingfield, defined a "bankruptcy based offer in compromise" as "bankruptcy based meaning that if you do not accept the offer, the taxpayer will go through bankruptcy and you will receive nothing." The IRS initially rejected Debtor's offer of $1,500.00, offered to release its lien in return for payment of $11,112.50, and ultimately agreed to release its lien against Debtor upon receipt of $4,037.50. The Debtor testified that he was not sure of the status of his tax liability to the IRS; he recalled that the IRS offered to settle for approximately $4,800.00 but that amount had not been paid. Debtor testified that only the monthly installments had been paid. The Debtor testified that at the time he made an offer to the IRS, he did not contemplate filing bankruptcy. Debtor testified that he decided to file bankruptcy in 2001 following the IRS' rejection of his offer and a discussion with his attorney regarding the uncertainty of the bankruptcy legislation pending in Congress.

The DFA requested an updated CIS in March 2000 to review Debtor's financial condition. Mr. McLean testified that Debtor submitted all information requested of him. Mr. McLean also testified that the DFA does not expect taxpayers to report additional income to the DFA whenever they get a raise or some extra income because more income is not necessarily an ability to pay more on a tax liability. Mr. McLean also testified that administrative limitations prohibited the DFA from monitoring a taxpayer's income tax returns to see if a taxpayer's income is increasing such that an installment agreement should be re-negotiated. Although the DFA does not review a taxpayer's tax returns to update the taxpayer's financial condition, Debtor testified that his income was different on his tax returns and the

CISs provided to the DFA. The Debtor explained that the difference was due to overtime and raises. Debtor testified that at the time he completed the CISs, the income reported was what he made. He subsequently earned overtime income and received some raises which resulted in higher income on his tax return. For example, the Debtor testified that at the time he completed the 1997 CIS, he was still farming and did not know whether he would suffer a loss or not, and accordingly put down what he expected to make. However, Debtor suffered a loss from farming in 1997 and reported that on his 1997 income tax return. Additionally, Debtor testified that if there was any discrepancy between the income reported on his bankruptcy petition and his year-to-date income, that would be due to overtime he received.

On the CISs submitted to the DFA, Debtor listed a residence in Pulaski County, Arkansas. The Debtor and his wife purchased the property in March 1992 for $30,000.00. Debtor valued his home at $30,000.00 on his bankruptcy petition. Debtor testified that he used that value because that is what he paid for the real estate and did not know that real estate values generally increase. He explained that because he lives in a rural area and is not currently farming, he could not speculate as to the value of his property. The Debtor explained that he used the best of his knowledge to arrive at the values listed on his bankruptcy petition and CISs. For example, on Debtor's 1997 CIS, he listed the 1990 Dodge truck as worth $20,000.00, the purchase price of the vehicle. Debtor testified that he later realized it was probably worth less.

On July 11, 2001, Debtor's counsel supplied the DFA with an unsworn letter from Pam Forster, a real estate broker and certified residential appraiser. Ms. For-

ster valued the Debtor's residence and five acres of land at between $40,000.00 and $60,000.00. Debtor subsequently amended his schedules to list the real property at a value of $40,000.00. Debtor testified that although he owns eight acres of real property, the appraisal only covered the five acres on which his house sits. The Debtor explained that the other three acres are swampland across the road, and when the appraiser came, his daughter failed to point out the three additional acres across the road. The Debtor also testified that he believes these three acres have no value as swampland because it would violate the law to do anything with the property. Debtor's 2000 CIS listed a total of eight acres of real property.

Some confusion has arisen over the county in which Debtor and his family reside. The Debtor explained that their property is actually in Pulaski County, but because he and his family live on the county line between Pulaski County and Lonoke County, and their children attend school in Lonoke County, they were told to pay real estate taxes to Pulaski County and personal property taxes to Lonoke County. Both the 1997 and 2000 CISs submitted by Debtor list Debtor's real estate location and county of residence as Pulaski County.

Debtor's 1998 Lonoke County Personal Property Assessment lists him as the sole owner of a 1997 Pontiac Grand Prix. The vehicle was titled in both Vickie and Dale Roper's names as of January 1, 1997. Debtor listed the vehicle on his bankruptcy petition as joint property worth $6,000.00. The Roper's 2000 and 2001 personal property assessment lists the following property which was not listed on Debtor's bankruptcy petition: a 1983 Johnson boat motor, a 1996 fishing boat motor, a 1990 GMC truck, a 1997 Chevrolet Fleetside Compact and a 1999 Dodge Ram

truck. The Debtor explained that his children had acquired some of the property listed on their tax assessments, and those items acquired by his children are not listed on his bankruptcy petition. The children purchased these items with their own money and took title to the property with his wife. The Debtor explained that title to certain vehicles was held by his wife and his children because the Debtor and his wife wanted some control over the children's vehicles even though the children were working and making payments on the vehicles.

On or about June 16, 2000, Vickie Roper borrowed $7,243.31 from Regions Bank secured by a 1996 homemade boat trailer, a 1996 homemade boat, and a 2000 Suzuki motor. Mrs. Roper's loan is acknowledged in the Debtor's bankruptcy schedules as a secured debt which Debtor intends to reaffirm. Debtor testified that the debt was listed in his bankruptcy because it is secured by his property. Debtor testified that he owned one boat and a trailer prior to purchasing the Suzuki motor. He made the boat and the trailer it went on, and at that time, he had an existing 1973 Chrysler motor. That motor blew up and he could not finance a new one. Accordingly, the new boat motor was financed by his wife and they used the homemade boat and trailer to secure the loan. There was some confusion regarding the homemade trailer because the 1996 model was listed as a 2000 model on the Debtor's personal property assessment; Debtor testified that this was due to some confusion in the assessor's office.

On January 23, 2001, ten days prior to Debtor's bankruptcy filing, Mrs. Roper purchased a 1999 Dodge Ram for $16,000.00 to be paid in monthly installments of $275.00 with no interest. Debtor testified that he put no money down on this vehicle which was purchased for his

use because he needed reliable transportation. The Debtor explained that he cannot buy anything because of the tax liens filed against him. Debtor did not disclose this vehicle on his bankruptcy petition. Debtor explained that any property purchased by his wife was in her name, and any property in his name was listed on his bankruptcy petition.

Debtor testified that he has continued to have financial troubles since losing his farm. For about three years, beginning in 1998, he farmed 100 acres of wheat because the property's owner requested that he do so. He borrowed tractors and got help from family members to farm this property. Debtor testified that he tithed to the church prior to 1996, but was unable to tithe in 1996 or 1997 because he had no income. He began tithing again in 1998, and made charitable contributions of approximately 10% of his adjusted gross income in 2000 and 2001 according to his income tax returns. Debtor testified that he and his wife paid for living expenses with credit cards obtained in his wife's name only due to the tax liens filed against him. From at least February 1998 and continuing until present, the Debtor and his wife deposited both their paychecks into a checking account upon which only she could draw. Debtor did not disclose this information in his bankruptcy petition. Debtor explained that he gives his paychecks to her and she pays the bills because it is the only way he can ensure that his earnings support his family. She also buys things for their family. The Debtor testified that he is currently working in the meat department at Kroger and has no pension plan or retirement funds whatsoever. The Debtor's adjusted gross income reported on his income tax returns for the years 1997 through 2000 ranged from approximately $29,000.00 to approximately $52,000.00, and his wife's adjusted gross income for the same time period ranged from approximately $15,000.00 to $18,000.00.

Despite Debtor's financial problems, he has paid off or reduced some of his debts since 1997. At the time Debtor signed the CIS provided to the DFA in 1997, he owed $17,800.00 on his house; $10,950.00 on the Pontiac Grand Prix; $2,668.00 on the Dodge Ram; and approximately $6,200.00 on credit cards. The CIS submitted to the DFA in 2000 listed a balance of $8,700.00 on the Debtor's home; total credit card debt of $9,168.00; a debt of $3,255.00 on the Pontiac Grand Prix; and a debt to his attorney, Neil Deininger, of $2,500.00 secured by the Dodge Ram. The Debtor explained that prior to filing bankruptcy, he paid off the Dodge Ram and incurred additional debt by giving his attorney a security interest in the Dodge Ram. Debtor explained that only one credit card, a Mastercard with outstanding balance of $3,387.12, was listed on his bankruptcy petition because the other credit cards previously listed on Debtor's CISs are in his wife's name only. When the Debtor filed bankruptcy, he owed $4,333.00 on his home, the Dodge Ram was paid off, and the Grand Prix had been paid down partially. The Debtor also explained that he and his wife have continued to make house payments since he filed bankruptcy in 2001 and the house is now paid off.

It is undisputed that at all times relevant, the Debtor has been aware of his duty to report and pay taxes. With the exception of tax year 1996, the Debtor and his wife, Vickie Roper, have paid all taxes reported on their returns for those years. Ms. Bowers also testified that she audited Debtor's 1998, 1999 and 2000 income tax returns and that she found no evidence of the Debtor having failed to report income, failed to file returns, reported implausible income, concealed assets, failed to cooper-

ate, shielded income, dealt in cash, or taken any other frustrating collection efforts.

## DISCUSSION

Debtor's complaint raises two issues. First, whether the state taxes are dischargeable; and second, whether the DFA's lien on Debtor's property is unsecured (*i.e.,* whether the lien is invalid or valueless as alleged by Debtor). The DFA alleges that the Debtor's state taxes are not dischargeable due to Debtor's willful attempt to evade the payment of his taxes. The DFA alleges that Debtor is not burdened by oppressive debts, has the means to pay his debts and has paid off $50,000.00 worth of other debts pre-petition.[1] The Debtor contends that he is an honest but unfortunate debtor who never intended to evade the payment of his taxes.

## I. *THE DISCHARGEABILITY OF DEBTOR'S STATE TAX LIABILITY.*

■■■■ Tax liability is nondischargeable under 11 U.S.C. § 523(a)(1)(C) if a debtor willfully attempts to evade or defeat the tax liability. There is a willful attempt to evade or defeat the tax if the debtor is aware of the duty to pay his taxes, has the wherewithal to pay those taxes and takes steps to avoid paying those taxes. *In re May,* 251 B.R. 714 (8th Cir. BAP 2000). Dischargeability under section 523(a)(1)(C) involves both an intent element and a conduct element. *Id.* Factors which indicate debtor's intent to evade tax obligations, for nondischargeability purposes, include understatements of income, failure to file tax returns, implausible or inconsistent behavior by debtor, failure to cooperate with tax authorities, concealment of assets, dealing

in cash, shielding income, and otherwise frustrating collection efforts. *Id.* These factors are not exclusive; other factors include choosing to pay other creditors rather than the tax authorities, *In re Wright,* 191 B.R. 291 (S.D.N.Y.1995), *In re Toti,* 24 F.3d 806 (6th Cir.1994), *Hochstein v. U.S.,* 900 F.2d 543 (2nd Cir.1990), and the Debtor's pattern of conduct, *In re Berzon,* 145 B.R. 247 (Bankr.N.D.Ill.1992).

■■■ A creditor must prove that a debt is nondischargeable by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because direct proof of intent is rarely available, intent may be proven by circumstantial evidence and reasonable inferences drawn from certain fact patterns. *Berzon; In re Bertelt,* 213 B.R. 173 (Bankr.M.D.Fla.1997); *In re Binkley,* 242 B.R. 728 (M.D.Fla.1999). Evidence presented must be viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally for the debtor to effectuate the fresh start policy of the Code. *In re Van Horne,* 823 F.2d 1285 (8th Cir.1987).

Upon a motion for judgment on partial findings under Rule 52(c), the trial court need not consider the evidence in a light favorable to the party with the burden of proof and may render judgment for the opposing party if the Court believes the evidence presented is insufficient to make out a case. *See Geddes v. Northwest Mo. State Univ.,* 49 F.3d 426, 429 n. 7 (8th Cir.1995).

■■ In this case, the DFA failed to prove that Debtor intentionally failed to pay his taxes. The DFA's argument is that the Debtor's payment of other debts

---

1. The DFA did not outline how it reached this figure; the evidence produced at trial indicated that approximately $35,000.00 to

$40,000.00 of pre-petition debt was paid off, including some debts attributable solely to Debtor's wife.

shows capacity and intent to evade the payment of his taxes. The DFA also argues that certain inconsistencies between Debtor's CISs, personal property assessments and bankruptcy petition, together with the Debtor's settlement negotiations with the IRS and DFA and threat of filing bankruptcy if the taxes were not settled, establishes a pattern of conduct by the Debtor to evade the payment of his taxes.

While the DFA presented evidence that Debtor paid some other debts prior to filing bankruptcy, these debts were primarily for normal household and living expenses (*i.e.,* necessities) such as car payments, house payments and credit card payments. The Debtor testified that he suffered serious financial problems as a result of losing his farm, and that he and his wife used credit cards to make ends meet. The Court credits the Debtor's testimony, and finds that while Debtor did pay some other debts prior to filing bankruptcy, given the Debtor's circumstances and the nature of the debts paid, the payment of other debts alone is insufficient to prove by a preponderance of the evidence that Debtor willfully attempted to evade his tax liability. Furthermore, through his attorney, the Debtor had ongoing negotiations with the IRS and DFA regarding the payment of his tax liabilities. While attempting to settle his tax liabilities, he arranged to pay his taxes in installments, and had an installment agreement with the DFA during this time period on which Debtor made all payments due. The adequacy of the installment agreement was reviewable by the DFA every six months and could also be tested by reviewing the Debtor's income tax returns during this time period. The Debtor was not obligated to report additional income to the DFA without being requested to do so. Accordingly, the Court finds that Debtor's payment of other debts while paying what he could afford on his taxes, and attempting to settle his tax liabilities, does not indicate an intent to evade tax liability.

The DFA argues that the inconsistencies between Debtor's CISs, personal property assessments and bankruptcy petition are evidence of Debtor's intention to conceal assets and evade the payment of his taxes. The Court does not agree. Even though only the Debtor's property was listed on his bankruptcy petition, all of the family's property was listed on the CISs and the personal property assessments. Regarding the value and size of Debtor's real estate, the Debtor valued his home at its purchase price for purposes of entering the installment agreement with the DFA. While the DFA insisted that the Debtor's failure to take into account appreciation on his home was an intentional misrepresentation, the Debtor claimed that he did not think his home was worth more than the purchase price. The Court finds the Debtor's testimony to be truthful, especially in light of the fact that the Debtor also valued his vehicle at its purchase price even though vehicles generally depreciate in value. Furthermore, once the Debtor obtained an appraisal of his home, he filed amended bankruptcy schedules indicating the appraised value of his home. Although the appraisal did not take into account three acres of swampland, the Debtor's explanation that the swampland is of no value is accepted by the Court. Additionally, the Debtor disclosed that he owned eight acres of real property on the 2000 CIS, and accordingly, the Court finds that Debtor did not intend to deceive the DFA as to the size of his real property. The Court concludes that the problems with verifying the value and size of Debtor's property, and the inconsistencies between Debtor's CISs, personal property assessments and his bankruptcy petition, were a result of oversight or lack of understanding rather than intentional acts.

The DFA also attempted to prove that Debtor hid assets and concealed income by having his wife purchase property for his use and by depositing his paychecks into her checking account. Once again, given the context in which these acts occurred, the Court does not agree. It is true that Mrs. Roper purchased and financed a new truck primarily for Debtor's use, purchased and financed a new boat motor for one of the family's homemade boats, and incurred credit card debt for family expenses. However, the Debtor explained that he could not obtain credit due to the tax liens filed against him, and his wife purchased these assets for the family's use, including his. It is also true that Debtor deposited his paychecks into a checking account maintained by his wife; however, Debtor's wife used this account to pay all the family's bills and expenses, and the Debtor had no checking account of his own. Under these circumstances, the Court finds the Debtor's reliance on his wife to purchase property and to maintain their bank account to be a method to ensure support for his family rather than an attempt to avoid taxes. *See Grow v. U.S. (In re Grow)*, 1997 WL 595088 (Bankr. S.D.Ala.1997) (Court held that taxes were dischargeable even though the debtor contributed all his money to his wife's checking account, did not maintain a checking account in his own name, and did not hold property in his own name).

When applied to the facts of this case, virtually none of the factors outlined in *In re May* indicate an intent to evade tax liability on the Debtor's part. Debtor filed all his tax returns and paid all other taxes other than his 1996 income taxes. Debtor established that he lost his farm in that year and had no income with which to pay the taxes. The Court credits the Debtor's testimony that he continued to have serious financial troubles following the loss of his farm. The Court finds that the Debtor

did not understate his income, conceal income or assets, or exhibit any other implausible or inconsistent behavior. Furthermore, the Debtor cooperated with the IRS and DFA by seeking to pay his tax liability in installments, attempting to negotiate a compromise of his tax liabilities, and providing financial information which was accurate to the best of his knowledge.

Of significant importance to the Court is that the Debtor and his family do not lead an extravagant lifestyle. The only evidence of an unnecessary expense is that the Debtor owned a boat, but even the Debtor's boat and trailers were homemade. All members of the family work, including the children who have several jobs each. Were this a sophisticated debtor seeking to maintain a lifestyle of "extras" by failing to pay past due taxes, the Court would view the banking method and other discrepancies in a different light. But Debtor's testimony established that he is an honest working individual who routinely reports and pays taxes and is attempting to create, with the participation of his wife and two children, a "no frills", stable family life. In sum, the DFA failed to prove by a preponderance of the evidence that the Debtor had enough income to both support his family and pay his taxes.

## II. *THE DFA'S LIEN ON DEBTOR'S PROPERTY.*

The Debtor asserts that the DFA's lien is valueless for five reasons: (1) the lien is void because it was filed in the wrong county; (2) the DFA's lien is secondary to the lien held by the IRS, and therefore, there is no equity in the Debtor's property to which the DFA's lien can attach; (3) the DFA's lien is unenforceable against Debtor because Debtor claimed his homestead as exempt; (4) the lien should be "stripped off" as a zero value tax lien; and (5) the

DFA's lien is unsecured because the DFA did not file a proof of claim in Debtor's bankruptcy, and Debtor filed a proof of claim on behalf of the DFA as unsecured.

■■■■■ The Court need not reach Debtor's latter arguments because the DFA's lien was recorded in the wrong county and did not attach to Debtor's property under Arkansas law. Pursuant to Ark.Code Ann. § 26–18–701(a)(3)(A), the recording of a certificate of indebtedness constitutes the state's lien upon the title of any real and personal property of the taxpayer in the county where the certificate is recorded. It is undisputed that the DFA recorded its certificate of indebtedness against the Debtor in Lonoke County on or around March 2, 1998. In its brief, the DFA asserts that Debtor testified his property "straddled the county line" between Pulaski and Lonoke counties. In fact, the Debtor testified that his property was "actually in Pulaski County" but "on the line." The Debtor explained that his family had moved down the road a mile, and following their move, they were informed that they lived in Pulaski County and had to pay real estate taxes to Pulaski County. While it is not disputed that Debtor's personal property is assessed in Lonoke County, it does not follow that his property is actually located there. Rather, Debtor testified that someone in England, Arkansas (Lonoke's county seat) told them to keep an England address and assess their personal property in Lonoke because they lived so close to the line, and their children went to England schools. The Court accepts the veracity of the Debtor's testimony, and finds there was no duplicitous reason for the inconsistencies.

The Court finds that Debtor's property is located in Pulaski County. The Debtor's real property taxes were paid to Pulaski County; Pulaski County assessment statements on the Debtor's real property were introduced in evidence. Since 1997, the Debtor has maintained that his property was located in Pulaski County. Both the 1997 and 2000 CISs provided to the IRS and DFA list his county of residence as Pulaski County. The IRS filed its tax lien in Pulaski County nearly two months before the DFA filed its lien in Lonoke County. Finally, although Debtor listed his county of residence as Lonoke County on his bankruptcy petition, his attorney has represented to the Court that this was a clerical mistake due to the Debtor's address being in England, Arkansas. In any case, the bankruptcy petition was filed nearly three years after the DFA's tax lien. Because the DFA's tax lien was filed on March 2, 1998 in Lonoke County, and the Debtor's real and personal property were located in Pulaski County at that time, the DFA's lien did not attach to the Debtor's property and the DFA's claim is unsecured. The DFA maintains that the location of Debtor's property is irrelevant because regardless of the property's location, it became property of the estate upon the Debtor's filing bankruptcy, and as involuntary creditors, the nonconsensual liens of the IRS and DFA attach to all property of the bankruptcy estate, including exempt property. While the DFA cites no authority for this proposition, the Court assumes it is referring to 11 U.S.C. § 522(c)(2)(B) which provides that properly noticed tax liens against exempt property survive a debtor's bankruptcy. A debtor cannot avoid a properly filed tax lien against exempt property due to the favored status given tax liens under this section. *See Walkup v. First Interstate (In Re Walkup),* 183 B.R. 884 (Bankr. E.D.Cal.1995) ("[A]ny conflict between a Chapter 7 debtor's avoiding powers and section 522(c)(2)(B) should be resolved in favor of the tax lien's perfected status."). However, section 522(c)(2)(B) applies only to "a tax lien, notice of which is properly

filed." This tax lien was filed in the wrong county, and therefore, the lien is not perfected. A debtor may avoid an unperfected tax lien on exempt property. *See Suarez v. U.S. (In re Suarez)*, 182 B.R. 916 (Bankr.S.D.Fla.1995). *See also In re Miller*, 98 B.R. 110 (Bankr.N.D.Ga.1989). In this case, the DFA is an unsecured creditor because its tax lien was not properly recorded, and accordingly, section 522(c)(2)(B) does not allow the DFA's lien to survive Debtor's discharge. Further, the Court finds that the DFA's lien is void under 11 U.S.C. § 506(d) as a lien securing an unsecured claim. *Cf. Schlossberg v. U.S. (In re Barnett)*, 62 B.R. 638 (Bankr. D.Md.1986) (Trustee could avoid IRS' lien because it was filed in the wrong county and therefore unperfected).

## CONCLUSION

The Court finds that the DFA failed to prove by a preponderance of the evidence that the Debtor willfully attempted to evade or defeat his tax liability, and accordingly, the Debtor's state tax liabilities are dischargeable. The Court further finds that the DFA's tax lien is void because it was recorded in the wrong county and did not attach to Debtor's property. Accordingly, it is

**ORDERED** that the Debtor's Complaint is **GRANTED,** the Debtor's state tax liabilities are dischargeable, and the DFA's lien is void pursuant to section 506(d).

**IT IS SO ORDERED.**